IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

CASE NOS. 12-4445, 12-4447, 12-4448, 12-4493

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

DOUGLAS L. WRIGHT, BRANDON L. BAXTER, CONNOR C. STEVENS, &
ANTHONY HAYNE,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the Northern District of Ohio
Eastern Division

---

CONSOLIDATED BRIEF OF PLAINTIFF-APPELLEE

---

Anthony J. Vegh                           STEVEN M. DETTELBACH
526 Superior Avenue, E.                   United States Attorney
Suite 720 Leader Building                 Northern District of Ohio
Cleveland, OH 44114
216-566-1424                              Duncan T. Brown
                                          Assistant United States Attorney
Counsel for Defendant-Appellant           801 West Superior Avenue, Suite 400
Douglas L. Wright                         Cleveland, OH 44113
                                          216-622-3933
                                          duncan.brown@usdoj.gov

Kevin Michael Schad
Federal Public Defender's Office
250 E. Fifth Street
Suite 350 Chiquita Center
Cincinnati, OH 45202
513-929-4834

Counsel for Defendant-Appellant
Brandon L. Baxter

Paul L. Nelson
Federal Public Defender's Office
50 Louis Street, N.W.
Suite 300
Grand Rapids, MI 49503
616-742-7420

Counsel for Defendant-Appellant
Connor C. Stevens

Dennis Belli
2 Miranova Place
Suite 710
Columbus, OH 43215
614-444-6556

Counsel for Defendant-Appellant
Anthony Hayne

Justin E. Herdman
Assistant United States Attorney
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
216-622-3965
justin.herdman@usdoj.gov

Thomas E. Getz
Assistant United States Attorney
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
216-622-3840
thomas.getz@usdoj.gov

Counsel for Plaintiff-Appellee

# **TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ........................................... vii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE.................................................................3

STATEMENT OF THE FACTS ............................................................7

SUMMARY OF THE ARGUMENT ...................................................19

ARGUMENT ................................................................................21

I. The District Court properly found that U.S.S.G. § 3A1.4 applied and that the crimes to which the Defendants pleaded guilty were "Federal Crimes of Terrorism."………..………………………………………………………....21

II. The District Court's Sentences Were Procedurally and Substantively Reasonable ……………………………………………………………………..31

III. The District Court's properly applied the leadership enhancement to Wright..39

IV. The District Court complied with Rule 32 and the objections raised by Baxter were addressed by the Court in its orders…………………………………41

CONCLUSION ..............................................................................49

CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION.................50

CERTIFICATE OF SERVICE ..............................................................51

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............52

# TABLE OF AUTHORITIES

PAGE(S)

## FEDERAL CASES

Gall v. United States, 552 U.S. 38 (2007)……………………………………...31

Pepper v. United States, 131 S. Ct. 1229 (2011) …………………………………31

United States v. Ables, 167 F.3d 1021 (6th Cir.), *cert. denied*, 527 U.S. 1027 (1999) …………………………………………………………………………..29

United States v. Amawi, 695 F.3d 457 (6th Cir. 2012) …………………………..22

United States v. Baker, 559 F.3d 443 (6th Cir. 2009) …………………………….31

United States v. Christanson, 586 F.3d 532 (7th Cir. 2009) ………………….....21

United States v. Christman, 607 F.3d 1110 (6th Cir. 2010) ……………………..31

United States v. Curry, 536 F.3d 571 (6th Cir. 2008) …………………………..31, 37

United States v. Graham, 275 F.3d 490 (6th Cir. 2011) ………………………....21

United States v. Hale, 448 F.3d 971 (7th Cir. 2009) ………………………..........21

United States v. Hall, 632 F.3d 331 (6th Cir. 2011) ……………………………...31

United States v. Hurst, 228 F.3d 751 (6th Cir.2000) ……………………………..42

United States v. Lang, 333 F.3d 678 (6th Cir.2003) ……………………………..42

United States v. McDavid, 396 Fed.Appx. 365 (9th Cir. 2010)(unpublished) …...21

United States v. Monus, 128 F.3d 376 (6th Cir.1997) ………………………..41, 42

United States v. Poulsen, 655 F.3d 492 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1772 (2012) ……………………………………………………………………37

United States v. Pruitt, 156 F.3d 638 (6th Cir. 1998), *cert. denied*, 525 U.S. 1091 (1999) …………………………………………………………………..29

United States v. Roche, 321 F.3d 607 (6th Cir. 2003) …………………………...29

United States v. Solorio, 337 F.3d 580 (6th Cir. 2003) …………………....41, 42

United States v. Stewart, et al, 590 F.3d 93 (2d Cir. 2009) …………………....29

United States v. Tackett, 113 F.3d 603 (6th Cir. 1997) …………………………..41

United States v. Tarwater, 308 F.3d 494 (6th Cir. 2002) …………………….…..41

United States v. Tolbert, 668 F.3d 798 (6th Cir. 2012) …………………………..21

United States v. Washington, No. 11-2364 (6th Cir., filed May 14, 2013) …...21, 39

United States v. Webb, 616 F.3d 605 (6th Cir. 2010) ………………………..21, 39

United States v. White, 492 F.3d 380 (6th Cir. 2007) …………………………....41

## FEDERAL RULES

Federal Rules of Appellate Procedure, Rule 34(a)(2)(C)  ……………………………. ..vii

Federal Rules of Criminal Procedure, Rule 32 …………………………….iii, 2, 41

Sixth Circuit Rule 30(b) …………………………………………………….52

## FEDERAL STATUTES

18 U.S.C. § 371…………………………………………………...….3

18 U.S.C. § 844(i)………………………………………………....3, 37

18 U.S.C. § 2332(a)(2)(B)……………………………………………… 3

18 U.S.C. § 2332(a)(2)(D)…………………………………….……..3

18 U.S.C. § 2332b(5)(g)(A)………………………………………..……...23

18 U.S.C. § 3231 ..................................................................……1

18 U.S.C. § 3553(a)………………………………..…16, 19, 20, 32, 34, 36, 38, 39

18 U.S.C. § 3742(a)………………………………………………..…1

28 U.S.C. § 1291………………………………………………..…1

U.S. Sentencing Guideline § 3A1.4………..……………………iii, 2, 13, 19, 21

U.S. Sentencing Guideline § 3B1.1(c)…………………………………..…40

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellee, the United States of America, submits that oral argument is unnecessary and that the case can be fairly decided on the briefs.  <u>See</u> Rule 34(a)(2)(C), Federal Rules of Appellate Procedure.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court derived jurisdiction under 18 U.S.C. § 3231.  (R.8: Indictment, PageID 154).  The Court entered final judgment against defendant-appellants Douglas Wright, Brandon Baxter, and Connor Stevens on November 20, 2012.  (R.208: Wright Judgment, PageID 3276; R.209: Baxter Judgment, PageID 3283; R.210: Stevens Judgment, PageID 3290).  The Court entered final judgment against defendant-appellant Anthony Hayne on November 30, 2012.  (R.229: Hayne Judgment, PageID 3410).  All defendants filed timely notices of appeal. (R.213: Baxter Notice of Appeal, PageID 3341; R.214: Wright Notice of Appeal, PageID 3343; R.217: Stevens Notice of Appeal, PageID 3349; R.233: Hayne Notice of Appeal, PageID 3420).  This Court derives jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## <u>STATEMENT OF THE ISSUES</u>

I.      Did the District Court clearly err in applying the terrorism enhancement in United States Sentencing Guideline § 3A1.4 because the government proved the offenses were committed with the intent to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct?"

II.      Did the District Court act unreasonably and commit procedural or substantive error in sentencing Baxter, Stevens or Hayne?

III.      Did the District Court properly apply the leadership enhancement to Wright?

IV.      Did the District Court address Baxter's objections in its Order concerning the application of the terrorism enhancement and its subsequent opinions?

## STATEMENT OF THE CASE

On April 30, 2012, Appellants Wright, Baxter, and Hayne were each named in a complaint charging one count of violating Title 18, United States Code, Section 371, conspiracy, and one count of violating Title 18, United States Code, Section 844(i), attempted use of explosive materials to damage or destroy real property used in interstate commerce.  On May 1, 2012, Appellant Stevens was named in a complaint charging the same violations.  (R.1: Complaints, PageID 123).

On May 3, 2012, the Grand Jury returned a three-count indictment against Wright, Baxter, Stevens, and Hayne.  (R.8: Indictment, PageID 154-55).  Count 1 charged each with conspiring to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a)(2)(B) and (D).  Count 2 charged each with attempted use of a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a)(2)(B) and (D).  Count 3 charged each with attempted use of an explosive device to damage or destroy real property used in interstate commerce, in violation of Title 18, United States Code, Section 844(i).

On July 25, 2012, Hayne pleaded guilty to Counts 1, 2 and 3 of the indictment.  (R.204: Hayne Change of Plea Hearing, PageID 3206).

On September 5, 2012, Baxter, Stevens and Wright entered guilty pleas to Counts 1, 2 and 3 of the indictment.  (R.156: Baxter Change of Plea Hearing,

PageID 1812; R.157: Stevens Change of Plea Hearing, PageID 1841; R.158: Wright Change of Plea Hearing, PageID 1872).

On October 5, 2012, the court ordered that oral argument about the sentencing guideline calculations would occur on November 5, 2012. The court also scheduled sentencing hearings for Wright, Baxter, and Stevens for November 19, 2012. (R.154: Order, PageID 1807).

On November 1, 2012, Wright, Baxter and Stevens filed a joint memorandum regarding the sentencing guidelines. (R.174: Joint Memorandum, PageID 2190). That same day, the government filed its objections to the final presentence report. (R.175: Memorandum of Law, PageID 2208).

On November 5 and 6, 2012, the court held oral argument regarding challenges to the sentencing guideline calculations for Wright, Baxter and Stevens. (R.179: Hearing, PageID 2260; R.180: Hearing, PageID 2475).

On November 8, 2012, Baxter filed a post-hearing memorandum regarding the terrorism enhancement. (R.181: Baxter Memorandum, PageID 2575). Wright and Stevens filed similar memoranda the following day. (R.182: Wright Memorandum, PageID 2585; R.183: Stevens Memorandum, PageID 2628). The government also filed a post-hearing memorandum on November 9, 2012. (R.184: Government Sentencing Memorandum, PageID 2648).

4

On November 14, 2012, the court issued an order concerning the guideline calculations for Wright, Baxter and Stevens.  (R.187: Memorandum Opinion and Order, PageID 2918).   The court found by a preponderance of the evidence that the terrorism enhancement applied to each defendant's conduct.  (Id., PageID 2944).  The court further found the following guideline ranges applied: Wright – 324 to 405 months; Baxter – 262 to 327 months; and Stevens – 188 to 235 months. (Id., PageID 2948, 2951).

On November 15, 2012, Baxter filed his final sentencing memorandum. (R.192: Baxter Sentencing Memorandum, PageID 2963).  Stevens and Wright filed their final memoranda the following day.  (R.198: Stevens Sentencing Memorandum, PageID 3028; R.199: Wright Sentencing Memorandum, PageID 3145).  The government filed its final sentencing memorandum on November 16, 2012.  (R.200: Government Sentencing Memorandum, PageID 3164).

Wright, Baxter and Stevens were sentenced on November 20, 2012.  Wright was sentenced to 138 months imprisonment and lifetime supervised release. (R.208: Judgment, PageID 3276).  Baxter was sentenced to 117 months imprisonment and lifetime supervised release.  (R.209: Judgment, PageID 3283). Stevens was sentenced to 97 months imprisonment and lifetime supervised release. (R.210: Judgment, PageID 3290).  Baxter, Wright and Stevens filed timely notices

of appeal.  (R.213: Baxter Notice of Appeal, PageID 3341; R.214: 1 Wright Notice of Appeal, PageID 3343; R.217: Stevens Notice of Appeal, PageID 3349).

On November 20, 2012, Hayne filed an amended sentencing memorandum. (R.202: Amended Sentencing Memorandum, PageID 3194).  That same day, Hayne also filed a conditional motion to withdraw his July 25, 2012 guilty plea if the Court sentenced him to more than one-half of the 97-month sentence issued to Stevens.  (R.203: Conditional Motion to Withdraw Plea, PageID 3202).  On November 30, 2012, Hayne was sentenced to 72 months imprisonment and lifetime supervised release.  (R.229: Judgment, PageID 3410).  At the sentencing hearing, the Court rejected the original binding sentencing agreement (but not the guilty plea) between the government and Hayne.  (R.234: Hayne Sentencing Tr., PageID 3434-35).  The rejected plea agreement was then filed under seal.  (R.224: Rejected Plea Agreement).  On December 6, 2012, Hayne filed a timely notice of appeal.  (R.233: Hayne Notice of Appeal, PageID 3420).

6

## STATEMENT OF THE FACTS

The indictment in this case related to the defendants' agreement and attempt to obtain plastic explosives, place them at the base of a busy highway bridge in a national park, and remotely detonate them as vehicles traveled over the bridge.  On July 25, 2012, Hayne entered guilty pleas to Counts 1, 2 and 3 of the indictment, under a written plea agreement with the government.  (R.204: Hayne Change of Plea Hearing, PageID 3206).

On September 5, 2012, Baxter, Stevens and Wright entered guilty pleas to Counts 1, 2 and 3 of the indictment.  (R.156: Baxter Change of Plea Hearing, PageID 1812; R.157: Stevens Change of Plea Hearing, PageID 1841; R.158: Wright Change of Plea Hearing, PageID 1872).  Although Wright, Baxter and Stevens did not plead guilty under a written plea agreement, each agreed to a statement of facts the government could have proven beyond a reasonable doubt at trial.  (See generally R.156: Baxter Change of Plea Hearing, PageID 1812; R.157: Stevens Change of Plea Hearing, PageID 1841; R.158: Wright Change of Plea Hearing, PageID 1872).

Specifically, Wright, Baxter and Stevens agreed that from about February 20, 2012 to April 30, 2012, they conspired with each other, "engaging in conversations about using explosive devices against government property."  These conversations eventually led Wright, Baxter and Stevens to acquire what they

thought was a weapon of mass destruction, specifically, "a destructive device composed of two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives." Wright, Baxter and Stevens planned to use the weapon to damage and destroy the Brecksville-Northfield High Level Bridge, a state highway in the Northern District of Ohio "used in interstate commerce or in an activity that affects interstate commerce." (R.158: Wright Change of Plea Hearing, PageID 1881-82; R.156: Baxter Change of Plea Hearing, PageID 1820-21; R.157: Stevens Change of Plea Hearing, PageID 1861-62).

Wright, Baxter and Stevens further agreed that on April 30, 2012, they "placed a destructive device composed of two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives at the base of the Brecksville-Northfield High Level Bridge." They then attempted to detonate the explosive devices from a remote location. (R.158: Wright Change of Plea Hearing, PageID 1882-83; R.156: Baxter Change of Plea Hearing, PageID 1821; R.157: Stevens Change of Plea Hearing, PageID 1862).

Wright, Baxter and Stevens also agreed that on April 30, 2012, they "maliciously attempted to damage or destroy, by means of explosives . . . real property used in interstate commerce, specifically the Brecksville-Northfield High Level Bridge, and aided and abetted each other to do the same." At no time did Wright, Baxter, or Stevens "have lawful permission or authority to possess or use

8

explosive devices or weapons of mass destruction." (R.158: Wright Change of Plea Hearing, PageID 1883; R.156: Baxter Change of Plea Hearing, PageID 1821-22; R.157: Stevens Change of Plea Hearing, PageID 1862-63). Fortunately, the F.B.I. detected the conspiracy before harm was done, and supplied the defendants with inert material instead of actual explosives.

While under oath, Wright, Baxter and Stevens each acknowledged the truthfulness of the factual basis as described to them. When the court next asked if the defendants had any questions, Wright, Baxter and Stevens all replied in the negative. The court then accepted the pleas, finding all three guilty on Counts 1, 2 and 3 of the indictment. (R.158: Wright Change of Plea Hearing, PageID 1883-84, 1894-96; R.156: Baxter Change of Plea Hearing, PageID 1822, 1834-36; R.157: Stevens Change of Plea Hearing, PageID 1863, 1867-69).

On November 5 and 6, 2012, the court held oral argument about the sentencing guideline calculations for Wright, Baxter and Stevens. (R.179: Hearing, PageID 2260; R.180: Hearing, PageID 2475). During the November 5 hearing, the government presented Hayne's testimony. (R.179: Hearing, PageID 2452-70). Hayne stated that he met Wright in late October 2011; during that time, Wright broached the topic of explosives. (Id., PageID 2453-55). Hayne further testified regarding his presence at an early November 2012 conversation between Wright, Baxter and Stevens on how to secure explosives. (Id., PageID 2456-57).

He initially heard of the plans to blow up the Brecksville-Northfield High Level

Bridge from Wright on April 29, 2012.  (Id., PageID 2458, 2467).  Hayne was told

the purpose of blowing up the bridge was to "[s]top the transportation of the 1

percent."  (Id., PageID 2459).  On April 29, 2012, Hayne, Wright, Baxter and an

informant ("CHS") obtained C-4 in order to blow up the bridge.  (Id., PageID

2458).  Hayne detailed the events of the following day:

> Q.     Okay.  Now, on April 30, what happened that evening?
> A.     We drove out to the location.  Douglas Wright, Connor Stevens,
>        Joshua Stafford planted the explosives by the bridge.
> Q.     What was your role?
> A.     I was a lookout.

(Id.).  Hayne further testified regarding the attempted detonation of the C-4

plastic explosives:

> THE COURT:       And I gather the plan was to plant the explosives
>                  and then leave and set it off from a later place?
> THE WITNESS:     Yes, Your Honor.
> THE COURT:       Were you there when you tried to set off the
>                  bomb?
> THE WITNESS:     Yes, Your Honor.
> THE COURT:       And who was there with you at that time?
> THE WITNESS:     Me, Douglas Wright, Connor Stevens, Brandon
>                  Baxter, Joshua Stafford and the CHS.

(Id., PageID 2469-70).

Following the November 5 and 6, 2012 oral argument, the court issued an

order concerning the guideline calculations for Wright, Baxter and Stevens.

(R.187: Memorandum Opinion and Order, PageID 2918).  The Court summarized

10

the offense conduct, which reflected that Wright first met the CHS during an

October 21, 2011 Occupy Cleveland protest at Public Square.  (Id., PageID 2928).

Wright, Baxter, Stevens and Hayne became acquainted with one another through

the Occupy Cleveland Movement, and briefly lived together in an abandoned

church following the October 21, 2011 protest.  (Id., PageID 2928-29).  During this

time, Wright discussed with the CHS the possibility of moving beyond traditional

protesting by using smoke bombs and other means with which he was familiar

from the Anarchist's Cookbook.  (Id., PageID 2929).  In a November 2011 meeting

with the CHS, both Wright and Baxter expressed their interest in doing "more than

what the Occupy people were doing."  (Id.).  In February and March 2012, Wright

and Baxter had additional meetings with the CHS.  The group discussed the

possibility of using bombs and explosives to attack several potential targets,

including a hospital, a bank, and the new Horseshoe Casino in downtown

Cleveland.  (Id.).  Wright, Baxter and the CHS also discussed blowing up various

bridges around the Cleveland area, and the resulting financial damage.  (Id.,

PageID 2929-30).

     Wright, Baxter and Stevens met with the CHS on several occasions through

April 1, 2012, and often discussed making or obtaining C-4 plastic explosives.

(Id., PageID 2930).  In fact, on April 1, 2012, Wright agreed to purchase C-4 from

an undercover agent.  (Id.).  Discussion then turned to where to use the explosives,

11

and on April 7, 2012, Wright, Baxter, Stevens and the CHS debated destroying the
Cleveland Federal Reserve Bank, the Cuyahoga County Justice Center, and the
Turning Bridge on the Cuyahoga River.  (Id., PageID 2930-31).  The group
eventually agreed to blow up the Brecksville-Northfield High Level Bridge.  (Id.,
PageID 2931).

On April 29, 2012, Wright, Baxter, Hayne and the CHS acquired two inert
C-4 plastic explosives from an undercover FBI agent.  (Id.).  The agent instructed
them on how to arm and detonate the explosives, and also delivered ballistic vests,
smoke grenades, and gas masks previously requested by Wright and Baxter.  (Id.).
The following day, while being surveilled, Wright, Baxter, Stevens and Hayne
worked together to place the C-4 explosives at the base of a support column of the
Brecksville-Northfield High Level Bridge.  (Id.).  After placing the bombs, Stevens
told Wright, Baxter and Hayne that he "loved them for what they just did, that he
thought this was the greatest act of terrorism in Cleveland since the 60s, and
thought that this would be a good learning experience for the next bombing, which
he hoped would involve a structural engineer to maximize damage."  (Id., PageID
3326-27).  They then repeatedly attempted to detonate the explosives from a
remote location.  (Id.).

After considering this evidence, the Court found that the conduct of Wright,
Baxter and Stevens, individually and collectively, was "calculated to influence and

affect the conduct of the government." (Id., PageID 2944). As a result, the court

ordered that the terrorism enhancement, U.S.S.G. § 3A1.4, applied to Wright,

Baxter and Stevens. (Id.). The court adopted the presentence report with respect

to the offense level calculations, making Wright's total offense level 36, Baxter's

34, and Stevens's 31. (Id., PageID 2950). After assigning a criminal history

category of VI to each defendant (pursuant to the terrorism enhancement), the

court found the following sentencing ranges applied: Wright – 324 to 405 months;

Baxter – 262 to 327 months; and Stevens – 188 to 235 months. (Id., PageID 2948,

2951).

> At the sentencing hearings, the court found that the defendants:
>
> [E]ventually agreed with the idea that violent action was necessary to influence the government and, after considering a number of alternatives for violence, chose a major bridge on State Route 82 in Cuyahoga County for placement of an inert C-4 explosive to detonate by phone signal at a safe place removed from the bridge. The act of terrorism behavior requires a significant period of incarceration which considers the background of each of the individual defendants.

(R.205: Memorandum Opinion as to Wright, PageID 3238; R.206: Memorandum

Opinion as to Baxter, PageID 3252; R.207: Memorandum Opinion as to Stevens,

PageID 3268; R.228: Memorandum Opinion as to Hayne, PageID 3408).

> The court further concluded that Wright led the group. (R.205:

Memorandum Opinion as to Wright, PageID 3238). He brought Baxter, Stevens

and Hayne into the plot, and initiated contact with the CHS. (Id.). "Wright was

the person who first mentioned making plastic explosives because he thought buying them was too expensive, and ultimately he came up with the idea to blow up the Route 82 Bridge after doing independent research on targets." (Id.).  The court also mentioned Wright's history of violence, particularly noting his "commit[ment] to the idea of violent activity."  (Id.).

The court noted that Baxter was the next person to join after Wright brought the CHS into the group.  (R.206: Memorandum Opinion as to Baxter, PageID 3253).  "Baxter was the first person to mention blowing up a bridge and asked the CHS how much C-4 would be needed to blow up the I-480 bridge in Valley View."  (Id.).  Baxter assisted in the plot by selecting targets and making plans to execute the attack, "specifically, he offered to use Occupy Wall Street protests on May Day as a distraction to attempts to blow up shipping traffic in the Cuyahoga River."  (Id.).

As to Stevens, the court pointed to the consensual recordings, noting Stevens' interest in blowing up oil wells and "resource extraction points."  (R.207: Memorandum Opinion as to Stevens, PageID 3261).  Stevens helped place the explosives, and stated that he wished he had been present during their purchase. (Id.).  After placing the bombs, Stevens told Wright, Baxter and Hayne that he "loved them for what they just did, that he thought this was the greatest act of terrorism in Cleveland since the 60s, and thought that this would be a good

14

learning experience for the next bombing, which he hoped would involve a structural engineer to maximize damage." (Id., PageID 3326-27).

As to Hayne, the court noted his late involvement in the plot. (R.228: Memorandum Opinion as to Hayne, PageID 3406). However, the rest of the defendants viewed him as a "senior role model." (Id.). Hayne was present when the C-4 was purchased. (Id.). Moreover, he was responsible for memorizing the code, and also acted as a lookout while Wright, Baxter and Stevens placed the bombs. (Id.).

During the sentencing hearings for Wright, Baxter and Stevens, the government recommended guideline sentences for each defendant. (R.236: Wright Sentencing Tr., PageID 3474; R.249: Baxter Sentencing Tr., PageID 3560; R.250: Stevens Sentencing Tr., PageID 3614). Ultimately, the court varied downward significantly and sentenced Wright to 138 months imprisonment, Baxter to 117 months imprisonment, and Stevens to 97 months imprisonment. (R.208: Judgment, PageID 3276; R.209: Judgment, PageID 3283; R.210: Judgment, PageID 3290). All three defendants were also sentenced to a lifetime term of supervised release. (Id.). Over the government's objections, the court justified the downward variance by explaining that "the C-4 explosives provided to [Wright, Baxter and Stevens] were inert and would not have caused any damage," and also that "the conduct of the CHS, while not rising to the level of entrapment,

15

necessarily facilitated in considerable measure the conduct of the defendant[s]."
(R.205: Memorandum Opinion as to Wright, PageID 3308; R.206: Memorandum
Opinion as to Baxter, PageID 3320-21; R.207: Memorandum Opinion as to
Stevens, PageID 3335-36).

     In analyzing the 18 U.S.C. 3553(a) factors, as to deterrence the Court noted
the media attention the case had received, explaining that the sentences, plus
lifetime supervised release, "with the attendant publicity will serve to persuade
others considering similar conduct to avoid such conduct."  (R.205: Memorandum
Opinion as to Wright, PageID 3309; R.206: Memorandum Opinion as to Baxter,
PageID 3321; R.207: Memorandum Opinion as to Stevens, PageID 3337).

     As to Wright specifically, the Court noted his "difficult childhood," and
history of substance abuse.  (R.205: Memorandum Opinion as to Wright, PageID
3308-10).  Also noting his "significant criminal history," the court opined that a
period of incarceration of 138 months, plus lifetime supervised release, would
likely persuade Wright "to resist any temptation for additional criminal conduct."
(Id., PageID 3309; R.236: Wright Sentencing Tr., PageID 3481).

     As to Baxter, the court cited his "troubling family history," and the fact that
he was "youthful" with a limited criminal history.  Consequently, the court found a
sentence of 117 months plus lifetime supervised release to be an "appropriate."

(R.206: Memorandum Opinion as to Baxter, PageID 3321; R.249: Baxter Sentencing Tr., PageID 3572).

As to Stevens, the court noted the "disquieting" police reports concerning multiple internet postings by Stevens in which he discussed "kill[ing] cops." (R.250: Stevens Sentencing Tr., PageID 3622-23; R.207: Memorandum Opinion as to Stevens, PageID 3333-36). However, due to Stevens' lesser role in planning the bombing, his initial reluctance to participate, and his age and history of substance abuse, the court found a downward variance to 97 months appropriate. (R.207: Memorandum Opinion as to Stevens, PageID 3336-37).

During Hayne's sentencing hearing, which was held after the other sentencings, the government relented from its earlier agreed sentence and contended that after applying the terrorism enhancement, the appropriate guidelines range would be 92 to 155 months. (R. 234: Hayne Sentencing Tr., PageID 3438). However, noting the "significant downward variances" already granted to Wright, Baxter and Stevens, the court varied even further downward to 72 months with lifetime supervised release, explaining that the variance was appropriate due to Hayne's cooperation with the government. (Id., PageID 3429; R.228: Memorandum Opinion as to Hayne, PageID 3403). Although the "intent on the part of [Hayne] to engage in this terrorist activity was present," the defendant's background and the fact that the explosives were inert was also "worthy of the

17

Court's consideration" when determining a sentence, (R.234: Hayne Sentencing

Tr., PageID 3445), "sufficient, but not greater than necessary, to comply with the

purposes of 18 U.S.C. § 3553(a)(2)."  (R.228: Memorandum Opinion as to Hayne,

PageID 3409).

## SUMMARY OF THE ARGUMENT

It was not clear error for the Court to apply U.S.S.G. § 3A1.4.  After providing both sides with the opportunity to present evidence regarding the application of the guideline enhancement, the Court properly considered precedent, the tapes of the defendants' own words, and the testimony of a co-defendant in applying the terrorism enhancement.  The Court weighed each defendant's arguments concerning their respective roles in the conspiracy, as well as their arguments about the ultimate failure of the plot.  Its decision that the enhancement applies was correct.

Likewise, the defendants' claim that the Court's sentences were procedurally and substantively unreasonable is unsupported by the lengthy record created throughout these proceedings.  During both hearings conducted by the Court, argument, testimony and evidence were presented concerning the role and applicable § 3553(a) factors of each defendant.  By holding two separate hearings and permitting counsel the opportunity to file supporting briefs before and after the hearings, the Court was procedurally reasonable.  Indeed, the Court's written orders address in detail specific factual and legal issues concerning each defendant's disposition.  Additionally, the sentences ultimately imposed were significantly below the guideline ranges, which the government believed were appropriate, and therefore no substantive prejudice occurred to the defendants.

19

The Court properly applied a leadership enhancement for Wright. His own words and actions, including recruiting accomplices and evaluating and selecting bomb targets support the adjustment. Moreover, even after finding a two-level enhancement was appropriate, the Court explained why certain §3553(a) factors warranted a substantial downward variance from Wright's guideline calculation.

Finally, the Court adequately addressed all of Baxter's objections in its written opinions and orders. Baxter had ample opportunity in written filings and during hearings to present argument, testimony and evidence to support the arguments he now claims were ignored. In fact, in the Court's two written opinion and orders, the evidence refuting Baxter's objections was discussed in detail. Regardless, given the significant downward variance from the guideline range granted by the Court, Baxter cannot demonstrate any material prejudicial effect on his sentence. The Court considered his offense conduct as well as all of the relevant §3553(a) factors in reaching a more than reasonable sentence.

## ARGUMENT

**I.    The District Court properly found that U.S.S.G. § 3A1.4 applied and that the crimes to which the Defendants pleaded guilty were "Federal Crimes of Terrorism."**

### A.    Standard of Review

The standard of review for fact questions involving the Sentencing Guidelines is clear error.  United States v. Tolbert, 668 F.3d 798, 800 (6th Cir. 2012).  This Circuit has determined that defining a crime as a "Federal Crime of Terrorism" is a factual finding.  United States v. Graham, 275 F.3d 490 (6th Cir. 2011).  The clear error standard is echoed in other Circuits' opinions on this subject as well.  See United States v. Hale, 448 F.3d 971 (7th Cir. 2009); United States v. Christanson, 586 F.3d 532 (7th Cir. 2009); United States v. McDavid, 396 Fed.Appx. 365 (9th Cir. 2010)(unpublished).  Clear error is defined as a finding "where, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. Webb, 616 F.3d 605, 609 (6th Cir. 2010).  Even if this were a mixed question of law and fact, the proper standard of review remains clear error.  United States v. Washington, 2013WL1955680 (6th Cir. filed May 14, 2013).

**B.** <u>**Argument**</u>

The Court took a deliberate route in reaching its decision to apply the terrorism enhancement. After the defendants pleaded guilty, the Court ordered Pre-Sentence Reports and sought objections to them by all parties. (R.154: Order, PageID 1807-08). Rather than merely holding a hearing where both objections to the Pre-Sentence Report and sentencing arguments were presented, the Court held bifurcated proceedings following the procedural precedent in <u>United States v. Amawi</u>, 695 F.3d 457 (6th Cir. 2012). In the first set of hearings, held on November 5 and 6, 2012, the Court considered the application of the terrorism enhancement to each defendant. (<u>See</u> <u>generally</u> R.179 and R.180: Oral Argument Transcripts, PageID 2260-2571). Before this hearing, the Court solicited briefs from all parties. During the hearing the Court permitted all parties to present testimony and relevant evidence. (R.154: Order, PageID 1807-08). Special Agent Ryan Taylor of the FBI and co-defendant Hayne testified for the government at the hearing and tapes of the defendants were presented. Only Baxter testified on his own behalf; Baxter also presented his father, while Stevens presented his mother and an explosives expert. (<u>See</u> <u>generally</u> R.179 and R.180: Oral Argument Transcripts, PageID 2260-2571).

The Court reviewed relevant case law from the Sixth Circuit, as well as from other jurisdictions. (R. 187: Memorandum Opinion and Order, PageID 2918-53).

This analysis included decisions by Courts that both applied, and refused to apply, the terrorism enhancement.  In addition to this survey, the Court discussed the facts upon which its decision to apply the terrorism enhancement was based, and considered language from the parties' briefs filed in objection to the Pre-Sentence Reports.  In issuing its order applying the terrorism enhancement, the Court found that the government had proven, by a preponderance of the evidence that each defendant acted to destroy the Route 82 Bridge to influence or intimidate the government:

> As indicated in *U.S. v. Assi*, *supra*, the two elements the government must establish are that one the offense must be "calculated to influence or affect the conduct of the government by intimidation or coercion..." and be a violation of a list of enumerated statutes set forth in 18 U.S.C. § 2332b(g)(5)(B).
>
> After considering the evidence as hereinbefore described, as well as the previously cited appellate decisions, the Court finds by a preponderance of the evidence that the conduct of the three defendants Wright, Baxter and Stevens, individually and collectively, was "calculated to influence and affect the conduct of the government." As a consequence, the Court finds that the terrorism enhancement applies to each of the three defendants.
>
> In so finding, the Court finds that the government brief with respect to Douglas Wright at pages 11 through 13 clearly establishes, by a preponderance of the evidence, that the terrorism enhancement applies to Douglas Wright. The Court further finds, by a preponderance of the evidence, that the conduct of the defendant Brandon Baxter as described in pages 13 through 16 establishes proof of the terrorism enhancement as to Baxter. Finally, the Court finds, by a preponderance of the evidence that the conduct of defendant Stevens as described in pages 16 through 18 of the government's brief

establishes by a preponderance of the evidence that the terrorism enhancement applies to the defendant Connor Stevens.

(R. 187: Memorandum Opinion and Order, PageID 2944).

That evidence, when viewed in light of each defendant's actions and the conspiracy as a whole, makes clear that the act of detonating the explosive devices at the base of the Route 82 Bridge was meant to convey a message to the civilian population, the corporate word, the financial system, and all levels of government. This was not an innocent "prank" satisfying a juvenile fascination with explosives. Rather, the defendant's own words show that this was a carefully considered, planned, and executed act of terrorism to demonstrate anarchist support for a planned nationwide strike to be held on May 1, 2012 (the day after the attempted detonation of the explosives in this case) and as a prelude to a "civil war" that would commence at the joint G-8/NATO Summit scheduled to be held in Chicago in the middle of May.

The evidence supporting the application of the terrorism enhancement to the defendants' conduct runs through the entire case and was properly referenced in the Court's written opinion. (R. 187: Memorandum Opinion and Order, PageID2944). The facts were established by reviewing hours of recordings of the defendants and the testimony of SA Taylor and Hayne. Topically, the evidence can be broken down into the following:

- Early Selection of Targets:  The Route 82 Bridge was but one of many locations proposed by the defendants (and not the CHS) as a target for violent action directed at government, corporate, and civilian populations.  (R. 184: Government's Sentencing Memorandum, PageID2685).  Before the defendants discussed specific targets for the explosive devices, they also suggested, in rough chronological order, taking violent action against Cleveland police officers (during an anarchist riot) (R. 37: Detention Hearing Transcript dated 05/30/2012, PageID345), bank signs in downtown Cleveland (R. 37: Detention Hearing Transcript dated 05/30/2012, PageID259), a hospital (R. 1: Complaint, PageID 97), the Horseshoe Casino in Cleveland (R. 37: Detention Hearing Transcript dated 05/30/2012, PageID261), the G-8 Summit in Chicago (R. 184: Government's Sentencing Memorandum, PageID2683-86), and the Republican and Democratic National Conventions (R. 1: Complaint, PageID 96).

- Targeting a Bridge:  Baxter originally suggested targeting a bridge to Wright and the CHS on March 28, 2012.  (R. 184: Government's Sentencing Memorandum, PageID2685).  Specifically, while driving over the bridge at the interchange at I-480 and I-77 (the Valley View Bridge), Baxter asked "How much [explosives] do we need to take out a bridge?"  (Id.).  In reference to the Valley View Bridge, Wright stated "This would be a good one" and Baxter followed by saying "It would be!"  (Id.).  This inquiry by defendant Baxter was made immediately following a discussion by Wright, Baxter and the CHS about the perceived start of a "civil war" in Chicago during the joint G-8/NATO Summit in mid-May. (R. 184: Government's Sentencing Memorandum, PageID2683-86).  Both Wright and Baxter suggested "coordinating" their efforts with the anarchist element in Chicago (Id.); thus, the original plan to target a bridge had at its very core a tie to the expected violent, anarchist protest of the G-8/NATO Summit. After a discussion about placing explosives on the columns of a bridge, Baxter stated "You know that... that if we… that this… if this is some… this happens they're gonna make security on almost every bridge in the entire [expletive] country."[1]  (R. 184: Government's

---

[1] Committing an act that would force the government to protect bridges clearly was calculated to influence and affect governmental conduct and necessarily impede public and commercial transportation.

Sentencing Memorandum, PageID2688). Wright responded, "No, just the important ones. But I mean, they got the Detroit Bridge, that would kill a bunch of people… that would kill a bunch of people." (R. 184: Government's Sentencing Memorandum, PageID2688-90). These conversations make clear that both Wright and Baxter supported the idea of disrupting commerce through targeting major transportation arteries, that they had considered the possibility of casualties.

- Purchase of Riot Gear: On March 28, 2012, Wright and Baxter met with an Undercover Employee (UCE) of the FBI. During this meeting, Wright and Baxter agreed to purchase five ballistic (i.e., bullet-resistant) vests, five retractable batons, ten canisters of tear gas, and five gas masks. (R. 184: Government's Sentencing Memorandum, PageID2708-18). These items were purchased for use in anarchist riot activities either in Cleveland or Chicago (during the G-8/NATO Summit) and would be used to engage law enforcement and other emergency responders. (R. 184: Government's Sentencing Memorandum, PageID2694-95, 2708-18).

- Anger at Cleveland City Hall: On March 31, 2012, Baxter expressed frustration with obtaining a permit from the city of Cleveland for the planned "Heart Fest" to be held at the end of April. (R. 184: Government's Sentencing Memorandum, PageID2732). Baxter proposed marching on Cleveland City Hall and telling them "we are not playing by your [expletive] rules… if you shut [Heart Fest] down, we will blow it wide open." (Id.).

- Purchase of C4 Plastic Explosive: On April 1, 2012, Wright negotiated the purchase of 8 blocks of C4 plastic explosive with the aforementioned UCE. During the negotiation of the purchase, Wright and the UCE specifically discussed using C4 on a supporting column for a bridge. (R. 184: Government's Sentencing Memorandum, PageID2727-30).

- Federal Reserve Bank in Cleveland: On April 1, 2012, following Wright's agreement to purchase the 8 blocks of C4 plastic explosive, the three defendants met with the CHS to discuss possible targets. (R. 184: Government's Sentencing Memorandum, PageID2747). Wright stated that they could attach the explosives underneath an

26

armored truck entering the Federal Reserve Bank in downtown
Cleveland.  (R. 184: Government's Sentencing Memorandum,
PageID2748).  Wright stated that this would "blow a big chunk of the
[expletive] Federal Reserve."  (Id.).  Baxter stated, "Ok, wait, wait,
wait, now we're talkin' a little bit like higher scale.  Let's just, let's
see this, this is an open group discussion on this… on what we could
be doin' right now."  (Id.).  Wright then stated, "I mean basically,
that's what planning is. You gotta figure out what you're doing."
(Id.).  Baxter then stated that "People have been attacking banks, and
the Federal Reserve, for a long time, little progress."  (R. 184:
Government's Sentencing Memorandum, PageID2749).

- Northeast Ohio Fusion Center:  Also on April 1, immediately
  following the discussion of targeting the Federal Reserve, Baxter
  stated "So I don't think anyone has ever done anything to [expletive]
  with the Fusion Center."[2]  (R. 184: Government's Sentencing
  Memorandum, PageID2750).  When asked where the Fusion Centers
  were located, Baxter stated that the largest one is in Ohio.  (Id.).
  Stevens then asked, "You talkin' about the DHS Fusion Centers?"
  (Id.).  After Baxter responded in the affirmative, Stevens then stated,
  "Hell yeah, man.  That would be a great [expletive] target."  (Id.).
  Baxter and Stevens then discussed a leaked report by the DHS about
  the Occupy Movement and the role of Fusion Centers in "oppressing"
  the Occupy Movement.  (R. 184: Government's Sentencing
  Memorandum, PageID2750-51).  Baxter and Stevens agreed that
  destroying the Fusion Center database would be difficult, but
  "monumental."  (R. 184: Government's Sentencing Memorandum,
  PageID2751).  Baxter stated that there might be less people there
  during the night.  (Id.).  Stevens then stated that the Northeast Ohio
  Fusion Center is located in Cleveland on the ninth floor of the Justice

---

[2] On March 28, 2012, Baxter observed a billboard for the Northeast Ohio Regional
Fusion Center.  Baxter stated "I hate these things [Fusion Centers]."  Baxter told
Wright and the CHS that the Fusion Centers "came out shortly after the PATRIOT
Act… and… they report to no one… They're a self-serving entity of the
government."  (R. 184: Government's Sentencing Memorandum, PageID 2683).

27

Center. [3]  (R. 184: Government's Sentencing Memorandum, PageID2752).

- The Cuyahoga County Justice Center:  Also on April 1, in the midst of the discussion of targeting the Northeast Ohio Fusion Center, Wright stated to Stevens, "Hey, Connor, what was I talkin' about? Takin' down the Justice Center… bringin' the Justice Center to the ground."  (Id.).  Wright then stated that he would wear a suicide vest filled with C4 plastic explosive into the Justice Center.  (Id.).  Baxter responded that "a long time ago, I was willing to do that… about a year ago, I was, I was really considering putting on a suicide vest." (Id.).  Stevens then stated, "My thing is that if you can survive the attack, like another day, then why, why not?"  (Id.).

- Guantanamo Bay:  Throughout the course of the conspiracy, the defendants expressed concern that they would be placed in military custody at Guantanamo Bay Naval Base if they were caught.[4]  (R. 184: Government's Sentencing Memorandum, PageID2786, 2802). These conversations reveal the objectives of the defendants were purely to coerce, intimidate, and retaliate against the government – actions for which they expected to be treated as terrorists.  For instance, on April 10, 2012, Baxter stated that "if we get caught for this we are going to Guantanamo Bay."  (R. 184: Government's Sentencing Memorandum, PageID2786).  Wright then agreed, "Yeah, we're not going to jail."  (Id.).  On April 18, 2012, Wright told the CHS that if they were caught, they would go "directly to Guantanamo Bay… do not pass go, do not collect two hundred dollars."  (R. 184: Government's Sentencing Memorandum, PageID2802).

- The Route 82 Bridge:  On April 18, 2012, Wright stated that he had identified a target in a "state park"; Wright confirmed that he had found this target on his own by using Google Maps.  (Id.).  Wright

---

[3] The Justice Center Complex is located in downtown Cleveland and houses the Cleveland Police Headquarters Building, the Cuyahoga County and Cleveland Municipal Courts Tower, and the Corrections Center.

[4] Since late 2001, members of Al Qaeda and associated terrorist groups who have been designated as unlawful enemy combatants have been detained in military custody at Guantanamo Bay Naval Base.

stated that they would obtain the explosives on April 27, which Wright stated was good because it still gave them four days before May 1st. (R. 184: Government's Sentencing Memorandum, PageID2800).This target, later identified conclusively as the Route 82 Bridge, was selected specifically for its location, its position on a major road connecting to an interstate highway, and the high volume of passenger and commercial vehicular traffic. The date of the intended detonation of the devices was also critical. As outlined above, the attack on the bridge was designed to coincide with the May 1st nationwide strike and the upcoming violent protest activity against the G-8/NATO Summit in Chicago.

- "Biggest Act of Terrorism": On April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Stevens proclaimed, in front of the others, "We just committed the biggest act of, only act of terrorism, [UI] that I know in Cleveland since the 1960's." (R. 184: Government's Sentencing Memorandum, PageID2820). Stevens then stated "The more I've been dealin' with [expletive] like this, the more I realize this like, Department of Homeland Security people, they've got their heads so far [expletive] up their [expletive]… it's so easy to run around them." (R. 184: Government's Sentencing Memorandum, PageID2821).

- Acknowledgment of Casualties: Also on April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Baxter asked, "How are we gonna make sure there's no cars on the bridge when it happens?" Wright responded, "We can't." Baxter replied, "Okay." Wright then stated, "All they gotta, if they notice the bridge shakin', they better floor it, that's all I gotta say." (Id.). A few moments later, Stevens added, "Ain't that the [expletive] American dream, to get a [expletive] burger at Applebee's and blowing up [expletive]." (R. 184: Government's Sentencing Memorandum, PageID2822).

(R. 175: Government's Objection to the Pre-Sentence Report, PageID 2220-26).

Thus, while the defendants may not agree with the Court's adoption of the evidence, much of court's opinion is based on tapes of the defendants' own words.

Furthermore, it is virtually never clear error for a court to credit the testimony of one side's witnesses and evidence over another, even where each has told a coherent and facially plausible story. United States v. Ables, 167 F.3d 1021 (6th Cir.), *cert. denied*, 527 U.S. 1027 (1999); *see also* United States v. Pruitt, 156 F.3d 638 (6th Cir. 1998) (Court of Appeals will defer to credibility determinations unless without foundation), *cert. denied*, 525 U.S. 1091 (1999); United States v. Roche, 321 F.3d 607 (6th Cir. 2003) (credibility determinations at sentencing must be accepted unless clearly contrary to the facts).

Finally, Wright's argument concerning *mens rea* is legally incorrect and his reliance on United States v. Stewart, 590 F.3d 93 (2d Cir. 2009), is ultimately misplaced.[5]  In that case, defendant Yousry was found to have had the terrorism enhancement improperly applied because the co-defendant's motivations were imputed to him, despite the fact that the only role he played was that of translator for the other defendants actually engaged in enhancable terroristic activities. Yousry is clearly distinguishable from each of these defendants as co-conspirators because, unlike Yousry, Wright, Baxter Stevens, and Hayne each took definite and certain physical action that clearly and unequivocally supported the objective to intimidate or influence the conduct of the government.  Indeed, unlike passively

---

[5] While incorporated in this section for the sake of efficiency, the *mens rea* argument was raised only by Wright.  It clearly is an argument arising from the general claim of procedural error.

30

translating conversations between parties as Yousry did, each defendant in the instant case traveled to the target bridge, was present when the IEDs were placed, armed and unsuccessfully detonated.  Indeed, each defendant was present when Stevens bragged that the detonation would be the "[B]iggest act of terrorism in Cleveland since the 60's."  (R. 184: Government's Sentencing Memorandum, PageID 2820).  Reviewing the facts in their totality, each defendant took material and definite steps to accomplish the goal of blowing up a bridge to intimidate and influence the government.  The Court properly considered those actions, in conjunction with the statements each defendant made during the course of the conspiracy, when making the correct factual finding that their acts were federal crimes of terrorism.  And indeed, by discussing each defendant's role separately, as well as and collectively, there can be no suggestion that the Court summarily or arbitrarily imputed to one defendant any actions or thoughts of another.

## II.    The District Court's Sentences Were Procedurally and Substantively Reasonable

### A.    <u>Standard of Review</u>

A court of appeals reviews a Court's sentencing determinations for "reasonableness." See Pepper v. United States, 131 S. Ct. 1229, 1241 (2011) (citing Gall v. United States, 552 U.S. 38, 49-51 (2007)). As this Court has explained, it "use[s] an abuse of discretion standard to assess whether a sentence is unreasonable." United States v. Christman, 607 F.3d 1110, 1117 (6th Cir. 2010). A court abuses its discretion when it imposes a sentence that is either procedurally or substantively unreasonable. Id.; see United States v. Hall, 632 F.3d 331, 335 (6th Cir. 2011); United States v. Baker, 559 F.3d 443, 448 (6th Cir. 2009) ("we review a district court's sentencing decisions 'under a deferential abuse-of-discretion standard' for reasonableness") (quoting Gall, 552 U.S. at 51). When, as here, the sentences include substantial downward variances, Defendants' burden of showing substantive unreasonableness is "demanding." United States v. Curry, 536 F.3d 571, 573 (6th Cir. 2008).

B.    **Argument**

1.    **The sentences were procedurally reasonable.**

As a consequence of the Court's bifurcated proceedings, each party had the opportunity to submit briefs exclusively on sentencing issues. Each party also had the opportunity to present witnesses and evidence at an individual sentencing hearing. The court explained at length the importance of conducting a full and robust sentencing hearing because of the effect the terrorism enhancement had on

the individual sentences.  To reinforce that impact, the court calculated an actual offense level based on its application of the terrorism enhancement and also discussed alternative offense levels if the terrorism enhancement did not apply.  (R. 187: Memorandum Opinion and Order, PageID 2947-53).  It also specifically set forth, for each and every defendant, additional §3553(a) factors that it was considering in imposing its sentence.  (Id.).  Ultimately, the court applied the terrorism enhancement, but used the §3553(a) factors unique for each defendant, to apply significant downward variances to each sentence.

At the conclusion of these proceedings, the Court issued separate sentencing opinions for each defendant in which each 18 U.S.C. § 3553(a) factor is discussed for each defendant.  In its Opinion and subsequent Order, the Court relied on the facts established in the prior hearing and explained the reasons for each defendants' substantial downward variances.  Each Order discussed the individual defendants' unique background, education, family situation, admission of guilt as provided in the Pre-Sentence Report, and the characteristics material to the § 3553(a) considerations.

The court found that Wright served as the group's leader.  (R.205: Memorandum Opinion as to Wright, PageID 3302).  Wright brought Baxter, Stevens and Hayne into the plot, and initiated contact with the CHS.  (Id.). "Wright was the person who first mentioned making plastic explosives because he

thought buying them was too expensive, and ultimately he came up with the idea to blow up the Route 82 Bridge after doing independent research on targets." (Id.). The court also mentioned Wright's history of violence, particularly noting his "commit[ment] to the idea of violent activity." (Id.). In applying the 3553(a) factors, the Court held that Wright experienced a "difficult childhood," and history of substance abuse. (Id., PageID 3308-10). Also noting his "significant criminal history," the court opined that a period of incarceration of 138 months, plus lifetime supervised release, would likely persuade Wright "to resist any temptation for additional criminal conduct." (Id., PageID 3309; R.236: Wright Sentencing Tr., PageID 3481). This sentence was a 186-month downward variance from the lowest Guideline range sentence sought by the government.

Turning to Baxter, the court noted that Baxter was the next person to join after Wright brought the CHS into the group. (R.206: Memorandum Opinion as to Baxter, PageID 3315). "Baxter was the first person to mention blowing up a bridge and asked the CHS how much C-4 would be needed to blow up the I-480 Bridge in Valley View." (Id.). Baxter assisted in the plot by selecting targets and making plans to carry out the attack, "specifically, he offered to use Occupy Wall Street protests on May Day as a distraction to attempts to blow up shipping traffic in the Cuyahoga River." (Id.). Baxter was also present at the time the bombs were planted and unsuccessfully detonated. The Court recognized that his "troubling

34

family history," and the fact that he is "youthful" with a limited criminal history affected its consideration of §3553(a). Consequently, the court found a sentence of 117 months plus lifetime supervised release to be an "appropriate conclusion." (R.206: Memorandum Opinion as to Baxter, PageID 3321; R.249: Baxter Sentencing Tr., PageID 3572). This sentence was a 145-month downward variance from the lowest Guideline range sentence sought by the government.

As to Stevens, the Court noted from the recordings Stevens' interest in blowing up oil wells and "resource extraction points." (R.207: Memorandum Opinion as to Stevens, PageID 3326). Stevens helped place the explosives, and stated that he wished he had been present during their purchase. (Id.). After placing the bombs, Stevens told Wright, Baxter and Hayne that he "loved them for what they just did, that he thought this was the biggest act of terrorism in Cleveland since the 60s, and thought that this would be a good learning experience for the next bombing, which he hoped would involve a structural engineer to maximize damage." (Id., PageID 3326-27). However, focusing on Stevens' limited role in planning the particular event at issue, his initial reluctance to participate, and his age and history of substance abuse, the Court found a sentence of 97 months appropriate. (R.207: Memorandum Opinion as to Stevens, PageID 3336-37). This was a 91-month downward variance from the lowest Guideline range sentence sought by the government.

As to Hayne, the court noted his late involvement in the plot. (R.228: Memorandum Opinion as to Hayne, PageID 3406). However, it observed that the rest of the defendants viewed him as a "senior role model." (Id.). Hayne was present when the C-4 was purchased. (Id.). Moreover, he was responsible for memorizing the detonation code, and also acted as a lookout while Wright, Baxter and Stevens placed the bombs. (Id.). However, noting the "significant downward variances" already granted to Wright, Baxter and Stevens, the court also varied downward in sentencing Hayne, explaining that the variance was also appropriate due to Hayne's cooperation with the government. (Id., PageID 3429; R.228: Memorandum Opinion as to Hayne, PageID 3403). Although the "intent on the part of [Hayne] to engage in this terrorist activity was present," the fact that the explosives were inert was also "worthy of the Court's consideration" when determining a variance. (R.234: Hayne Sentencing Tr., PageID 3445). Pointing again to the media attention received by the case, Hayne's limited criminal history and substance abuse problems, the court opined that a sentence of 72 months would be "sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a)(2)." (R.228: Memorandum Opinion as to Hayne, PageID 3409).

All four defendants were also sentenced to lifetime supervised release, an integral part of the sentence as a whole. (Id.). As to deterrence, the court

36

explained that lifetime supervised release "with the attendant publicity will serve to persuade others considering similar conduct to avoid such conduct." (R.205: Memorandum Opinion as to Wright, PageID 3309; R.206: Memorandum Opinion as to Baxter, PageID 3321; R.207: Memorandum Opinion as to Stevens, PageID 3337). In light of the court's entire sentence, this logic is quite reasonable.

Thus, the defendants cannot identify where the Court was procedurally unreasonable because, quite simply, it was not. Indeed, even the desired result sought by the defense would result in scant relief. As is discussed below, the sentences are subject to statutory mandatory minimum of five years incarceration. Thus, the sentences described in the alternative by the Court are largely unavailable because, they too, would violate statutory requirements and be procedurally unreasonable. The sentencing court's explanation of the sentencing alternatives was not only procedurally proper, but when read within the context of explaining the mechanics of determining a reasonable sentence; it should reassure this Court that the ultimate sentences were not the result of a compromise between the perceived lesser of two procedural errors, but the work of a trial judge simply seeking to explain his reasoning.

### 2. The sentences were substantively reasonable.

The sentences imposed by the Court were, likewise, substantively reasonable. As with the previous arguments, the defendants' claims rely upon a

hope that the terrorism enhancement was improperly applied; however, that hope is
of cold comfort.  There is, in the Sixth Circuit, a strong presumption that below-
Guideline sentences are reasonable.  United States v. Poulsen, 655 F.3d 492 (6th
Cir. 2011), *cert. denied*, 132 S. Ct. 1772 (2012); United States v. Curry, 536 F.3d
571, 573.  All of the defendants' sentences were significantly below the Sentencing
Guideline ranges applicable to these terrorist acts.

As noted above, although the Court discussed possible sentences if the
terrorism enhancement did not apply, (R. 187: Memorandum Opinion and Order,
PageID 2947-53), reliance on these ranges is improper because, as recognized by
the Court, they are largely illusory and ignore the 60-month statutory mandatory
minimum required by 18 U.S.C. § 844(i).  (Id.).  Therefore, for the defendants to
now rely on calculations that could never legally be imposed as proof that their
sentences were substantially unreasonable is, in itself, unreasonable.

Indeed, even Stevens' claim that lifetime supervised release is substantively
unreasonable is belied by the Court's written sentencing order clearly expressing
the reasons supported by §3553(a) for the sentence.  In the court's opinion, it stated
that lifetime supervised release, "will serve to persuade others considering similar
conduct to avoid such conduct."  (R.207: Memorandum Opinion as to Stevens,
PageID 3337).

38

The term of supervised release is well within the discretion of the Court and there is no evidence to suggest that the Court did not consider every sentencing option. Rather than suggesting that the Court engaged in a compromise by trading less prison time for post-release supervision, a reading of the Court's order clearly shows that Stevens' age, potential for post-release rehabilitation, and family support were considered. The Court, however, also recognized that Stevens had engaged in criminal activity before this arrest and had expressed views that were "disquieting:"

> The internet postings by the defendant some five years ago suggest that the defendant's participation in the criminal conduct to which he offered a plea of guilty was in keeping with his former postings.
>
> As a consequence, the Court has concluded that a variance downward to a sentence of 97 months, plus a period of supervised release for life is an appropriate conclusion. [6]

(R.207: Memorandum Opinion as to Stevens, PageID 3273).

Therefore, the Court properly fashioned a sentence that took into consideration all of the §3553(a) considerations and was substantively reasonable.

## III.    The District Court's properly applied the leadership enhancement to Wright.

---

[6] However, the Court stated that the absence on Stevens' part of any educational ambition, coupled with his drug abuse addiction, gave the Court concern about Stevens' future actions once he served his sentence.

A.    **Standard of Review**

This Circuit has ruled that sentencing enhancements should be reviewed using a deferential standard.  United States v. Washington, 2013WL1955680, ("Accordingly, we hold that, under the reasoning in Buford, review of the legal conclusion that a person is an organizer or leader under Section 3B1.1 is also deferential);" *See also* Webb, 335 F.3d at 538.

B.    **Argument**

Granting the Court proper deference, applying a two-level enhancement for Wright was proper.  In its Order (See generally, R.205: Memorandum Opinion as to Wright, PageID 3241), the Court noted that the informant working for the FBI, while a participant, did not entrap any of the defendants.  Rather, it concluded, based on briefs and testimony from Anthony Hayne, that Wright took a leadership role within the conspiracy.

Wright now argues that, because the FBI informant played a role within the conspiracy, no enhancement should apply.  However, after considering all of the evidence presented, the Court adopted a view of the conspirators that evaluated the role of each of the defendants.  (R.205: Memorandum Opinion as to Wright, PageID 3239).  Moreover, the Court did not blindly apply this enhancement.  It balanced the CHS's role as well as Hayne's testimony, who stated that Wright

recruited him, told him of the plan to blow up the bridge, organized procuring the explosives, and was there when the conspirators tried to detonate the bombs. (Id.).

The court further found that Wright acted in a leadership role within the group. (R.187: Memorandum Opinion and Order, 2946). Specifically, he brought Baxter, Stevens and Hayne into the plot, and initiated contact with the CHS. (Id.). "Wright was the person who first mentioned making plastic explosives because he thought buying them was too expensive, and ultimately he came up with the idea to blow up the Route 82 Bridge after doing independent research on targets." (Id.). The court also mentioned Wright's history of violence, particularly noting his "commit[ment] to the idea of violent activity." (Id.).

In its decision, the Court declined to apply leadership enhancements to any of the other participants, and declined to apply either the three or four-level enhancement to Wright:

> The Court notes that the presentence report of the defendant Wright provides for an upward adjustment of two levels for a leader in the criminal activity under the provisions of 3B1.1(c).

(R.187: Memorandum Opinion and Order, 2946).

Thus, crediting the Court the deference it is due, and recognizing that it was in a position to fully consider the entire body of evidence presented during the course of the prosecution, the Court's decision was proper and should be affirmed.

## IV.  The District Court complied with Rule 32 and the objections raised by Defendant Baxter were addressed by the Court in its orders.

### A.    <u>Standard of Review</u>

The standard of review in the Sixth Circuit when examining whether Federal Rule of Criminal Procedure 32 was met is a *de novo* review for "literal compliance."  <u>United States v. White</u>, 492 F.3d 380 (6th Cir. 2007); <u>United States v. Tackett</u>, 113 F.3d 603 (6th Cir. 1997).

### B.    <u>Argument</u>

While Baxter suggests that "literal compliance" necessitates a rote listing of the objection followed by the court's resolution of the objection, case law suggests that "literal compliance" requires simply that the sentencing court do more than merely "summarily adopt" the findings in the Pre-Sentence Report by discussing how and why it reached the conclusions it did and "not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence."  <u>Solorio</u>, 337 F.3d 580, 598 (6th Cir. 2003), *quoting* <u>United States v. Tarwater</u>, 308 F.3d 484, 518)(6th Cir. 2008); *see also* <u>United States v. Monus</u>, 128 F.3d 376, 396 (6th Cir. 1997).  Moreover, the Court is required to engage in this extended analysis only when the defendant actively raises objections, and the disputed facts could prejudiciously affect the defendant's sentence.  <u>United States v. Solorio</u>, 337 F.3d 580; <u>United States v.</u>

Hurst, 228 F.3d 751, (6th Cir.2000); United States v. Lang, 333 F.3d 678 (6th Cir.2003); Monus, 128 F.3d 376.

Applying this standard, Baxter's argument fails completely because it ignores the extensive record made by the Court based on its review of briefs and evidence before and during two evidentiary hearings concerning the defendant's sentencing. Although Baxter lists five objections raised in his original objection to the Pre-Sentence Report he now claims were never addressed, it is that list, and not the court's sentencing, that is rote. A substantive comparison of those objections with the court's Order demonstrate that the claims were not supported by the extensive record created by the government, the defendant's counsel and the defendant himself, and also highlights the fact that the Court did materially and literally address every objection that affected its sentencing decisions.

Baxter raised his five objections at the November 5, 2012 hearing. His counsel clearly made these objections to the Pre-Sentence Report. (R.179: Oral Argument Transcript, Page ID 2270-72). Thus, the first consideration, that the objections were actively raised, is satisfied.

The record fails to support the Baxter's claim of procedural error, however. At the November 5 and 6 hearing, the Court allowed both sides to present testimony and argument concerning the statement of facts, objections to the Pre-Sentence Report, and the proper application of the Sentencing Guidelines.

43

Furthermore, based on those presentations, the Court issued a written Order. (R.154: Order, PageID 1807-08).  In addition to Baxter presenting his objections in writing, he had further opportunity to further advance his preferred factual summary during both cross-examination of government witnesses and while presenting evidence.  Indeed, when cross-examining Special Agent Taylor, Baxter's counsel asked questions directly relevant to each objection.  (R.179: Oral Argument Transcript, Page ID 2396-2419).  SA Taylor was asked about the lag in communications Baxter had during the month of March, 2012.  (R.179: Oral Argument Transcript, Page ID 2397-99), SA Taylor also was questioned about the events of March 28, with counsel emphasizing that because Baxter was not present, he should not be held culpable for the group's actions.  (R.179: Oral Argument Transcript, Page ID 2409-11).  Finally, counsel examined SA Taylor on Baxter's lack of participation between April 10 and 27.  (R.179: Oral Argument Transcript, Page ID 2416-17).  This line of questioning clearly was meant to support the claim that Baxter's role was minimal and that the terrorism enhancement was unsupported.

Baxter also testified on his own behalf.  (R.180: Oral Argument Transcript, Page ID 2478-2566).  Given that the purpose of the proceeding was to present facts for the Court to weigh during the sentencing phase of the case, it is disingenuous

for Baxter to now claim that his objections were ignored, despite presenting the Court with direct testimony.

Likewise, in its subsequent Sentencing Memorandum for Defendant Baxter (R.206: Memorandum Opinion as to Baxter, PageID 3243-3257), the Court discussed the facts it adopted – facts drawn from the evidence presented by all parties as well as the Pre-Sentence Report. The memorandum discussed the factual basis for the sentencing decision at length, including Baxter's own admissions made under oath at his change of plea hearing. In summary, the Court detailed at length the participation of each defendant on specific dates concluding that:

> Brandon Baxter was the second person to join the plot after Wright brought the CHS into the group. Baxter was the first person to mention blowing up a bridge and asked the CHS how much C-4 would be needed to blow up the I-480 Bridge in Valley View. Baxter helped select targets and develop plans to carry out the attack, specifically, he offered to use Occupy Wall Street protests on May Day as a distraction to attempts to blow up shipping traffic in the Cuyahoga River.

(R.206: Memorandum Opinion as to Baxter, PageID 3247).

Thus, although Baxter objects to the Court's factual determinations, the Court's decision was not reached arbitrarily and did not ignore the evidence and argument presented by Baxter.

Likewise, Baxter cannot legitimately argue that by ignoring his objections, his sentence was negatively affected. Rather, the Court took great pains not only to consider every sentencing factor, but assimilated a great amount of information

into each Order and Memorandum it drafted. It is immaterial that the Court's

orders did not address each objection explicitly. The Court's Sentencing

Memorandum fully considered the objections and considered them when imposing

sentence:

<u>The Brief of the Defendant in Support of a Downward Variance</u>

Counsel for the defendant Brandon Baxter contends that the
first consideration by the Court with respect to the sentencing of the
defendant Brandon Baxter should be his traumatic childhood over
which he had no control. The second consideration advanced by
counsel for the defendant is the contention that Brandon Baxter is a
"reparable human being" who does not need to be locked up for a
protracted period of time. The third argument advanced by Brandon
Baxter's counsel is the extent of the CHS's involvement in this case.

Initially, counsel for the defendant Baxter contends, based upon
the attached character reference letters, that Baxter is a sensitive,
compassionate and intelligent young man who has gained significant
insights into his behavior and therefore is a redeemable human being.
Counsel for the defendant Baxter focuses on his difficult youth by
reason of his mother and stepfather being drug and alcohol abusers
while he was growing up and concludes with the proposition that it is
not surprising that Baxter began using alcohol and drugs at an early
age and spent time in mental hospitals as a result of his suicide
attempts. Baxter's counsel also refers to the fact that at the age of 17,
Brandon Baxter tried to stab his stepfather because he believed that
his stepfather had hit his mother resulting in Baxter being sent to the
juvenile detention center and eventually being sent to the Parmadale
Treatment Center where he received some counseling and many drugs
to treat his mood disorders.

Continuing, Baxter's counsel indicates that in June of 2011,
Brandon Baxter became involved with a group of Christian Anarchists
who operated a charitable project called "Food Not Bombs."
Subsequently, Baxter met Connor Stevens who shared many of

Baxter's feelings. Continuing, Baxter's counsel alleges that Baxter's "youthful exuberance" for the Occupy movement was dampened when the tent city protest ended. As a consequence, Baxter moved in with his father whose home was in foreclosure. Baxter reverted back to heavy drinking and drug abuse accompanied by bouts of depression which resulted in another suicide attempt on February 12, 2012. Following the suicide attempt, Baxter reports that he received a call from Douglas Wright indicating that the CHS wanted to meet them again which led to job offers. Baxter's counsel then turns to what he identifies as the most significant "circumstance" being the government's use of the CHS who Baxter's counsel contends has a long track record for being a master manipulator.

Continuing, Baxter's counsel contends that the tapes demonstrate that the CHS undertook a persistent campaign to persuade the defendants to select a target in which to use C-4 explosives. Consequently against the described background, counsel for the defendant argues for a substantial downward variance.

### The Sentencing Brief of the Government with Respect to the Defendant Brandon Baxter

The government's brief, ECF 184, at pages 13, 14, 15 and 16, outlined in great detail the conduct of Brandon Baxter with the beginning statement to the effect that "Baxter most clearly articulated the objectives of the conspiracy following his arrest."

In the Court's opinion filed November 14, 2012, ECF 187, the Court found that the terrorism enhancement should apply. However, the Court also calculated the guidelines as if the (continued...)

Then in describing Brandon Baxter's conduct, the government's brief describes Baxter's conduct in "interested in explosives" frustration with the Occupy Cleveland Movement, its black block interest in connection with the G8/NATO Summit to be held in Chicago beginning May 1, 2012, the purchase of riot gear, the anticipated "civil war" in Chicago, targeting the federal reserve, targeting the Fusion Center and the anticipation of a sentence to

47

Guantanamo Bay, if captured, and Baxter's description of his motive where Baxter is quoted as saying "our politicians and most every aspect of our society are controlled by ... large corporate empire ... and they pay police off to get away with things and pay for politicians' campaigns and get their own people on regulation agencies and in our departments so they can do almost anything."

<u>The Findings of the Court Justifying a Downward Variance</u>

First, the Court finds that the C-4 explosives provided to the defendant were inert and would not have caused any damage. Second, the conduct of the CHS, while not rising to the level of entrapment, necessarily facilitated in considerable measure the conduct of the defendant Brandon Baxter. The Court also finds that the defendant Brandon Baxter to be youthful, with a troubling family history coupled with suicide attempts by the defendant Brandon Baxter. The defendant Brandon Baxter also has a limited criminal history resulting from two juvenile adjudications as indicated in paragraphs 46 and 47 of the presentence report.

As a consequence, the Court has concluded that a variance downward to a sentence of 117 months, plus a period of supervised release for life is an appropriate conclusion.

(R.206: Memorandum Opinion as to Baxter, PageID 3252-55).

The court in this case was anything but dismissive or rote. It took great pains to consider each defendant's arguments at sentencing, including Baxter's briefs and testimony when imposing sentence. Thus, given the carefully considered justifications provided by the Court, his claim must fail.

48

## **CONCLUSION**

For the foregoing reasons, the Court should be affirmed.  It properly calculated the Guidelines and the sentences were procedurally and substantively reasonable.

**<u>CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION</u>**

I hereby certify that the foregoing contains 12,173 words according to the word counting feature of Microsoft Word 2010 and complies with this Court's 14,000 word limitation for briefs.

<u>/s/ Duncan T. Brown</u>
Duncan T. Brown
Assistant United States Attorney

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of May, 2013, a copy of the foregoing Brief of Plaintiff-Appellee, was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Duncan T. Brown</u>
Duncan T. Brown
Assistant United States Attorney

51

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), the following filings from the Court's

records are designated as relevant to this appeal:

| DESCRIPTION OF ENTRY | RECORD ENTRY NO. | PAGE ID RANGE |
|---|---|---|
| Complaint (Wright, Baxter, Stevens, Hayne) | 1 | 123-44 |
| Indictment | 8 | 154-55 |
| Arrest Warrant (Wright, Baxter, Stevens, Hayne) | 9 | 159-63 |
| Order dated 05/17/2012 | 23 | 197 |
| Order dated 05/22/2012 | 28 | 212-14 |
| Detention Hearing Transcript dated 05/30/2012 | 37 | 241-382 |
| Order dated 06/12/2012 | 60 | 707-19 |
| Transcript of 05/07/2012 Arraignment | 64 | 727-45 |
| Order dated 10/05/2012 | 154 | 1807-08 |
| Change of Plea Hearing Transcript (Baxter) dated 09/05/2012 | 156 | 1812-40 |
| Change of Plea Hearing Transcript (Stevens) dated 09/05/2012 | 157 | 1841-71 |
| Change of Plea Hearing Transcript (Wright) dated 09/05/2012 | 158 | 1872-99 |

| | | |
|---|---|---|
| Joint Memorandum regarding Objections and Responses to Application of Various Sentencing Guidelines | 174 | 2190-2207 |
| Government's Memorandum of Law and Objections to the Final Presentence Reports | 175 | 2208-28 |
| Oral Argument Transcript dated 11/05/2012 | 179 | 2260-2474 |
| Oral Argument Transcript dated 11/06/2012 | 180 | 2475-2574 |
| Memorandum (Baxter) | 181 | 2575-84 |
| Memorandum (Wright) | 182 | 2585-2627 |
| Memorandum (Stevens) | 183 | 2628-47 |
| Government's Sentencing Memorandum | 184 | 2648-2889 |
| Memorandum Opinion and Order dated 11/14/2012 | 187 | 2918-53 |
| Sentencing Memorandum (Baxter) | 192 | 2963-3005 |
| Sentencing Memorandum (Stevens) | 198 | 3028-3130 |
| Sentencing Memorandum (Wright) | 199 | 3145-63 |
| Government's Final Sentencing Memorandum | 200 | 3164-85 |
| Amended Sentencing Memorandum (Hayne) | 202 | 3194-3201 |
| Conditional Motion to Withdraw Plea (Hayne) | 203 | 3202-05 |
| Change of Plea Hearing Transcript (Hayne) dated 07/25/2012 | 204 | 3206-27 |

| | | |
|---|---|---|
| Memorandum Opinion as to Wright Analyzing the Sentencing Factors Set Forth in 18 U.S.C. Section 3553(a) | 205 | 3228-42 |
| Memorandum Opinion as to Baxter Analyzing the Sentencing Factors Set Forth in 18 U.S.C. Section 3553(a) | 206 | 3243-57 |
| Memorandum Opinion as to Stevens Analyzing the Sentencing Factors Set Forth in 18 U.S.C. Section 3553(a) | 207 | 3258-75 |
| Judgment (Wright) | 208 | 3276-82 |
| Judgment (Baxter) | 209 | 3283-89 |
| Judgment (Stevens) | 210 | 3290-96 |
| Notice of Appeal (Baxter) | 213 | 3341-42 |
| Notice of Appeal (Wright) | 214 | 3343-44 |
| Notice of Appeal (Stevens) | 217 | 3349-50 |
| SEALED Rejected Plea Agreement | 224 | |
| Memorandum Opinion as to Hayne Analyzing the Sentencing Factors Set Forth in 18 U.S.C. Section 3553(a) | 228 | 3402-09 |
| Judgment (Hayne) | 229 | 3410-16 |
| Notice of Appeal (Hayne) | 233 | 3420-21 |
| Sentencing Hearing Transcript (Hayne) dated 11/30/2012 | 234 | 3422-53 |
| Sentencing Hearing Transcript (Wright) dated 11/20/2012 | 236 | 3455-85 |

54

| | | |
|---|---|---|
| Sentencing Hearing Transcript (Baxter) dated 11/20/2012 | 249 | 3530-75 |
| Sentencing Hearing Transcript (Stevens) dated 11/20/2012 | 250 | 3576-3628 |
| | | |
| | | |
| | | |
| | | |